IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of: | No. 85482-8-I |
| RICHARD JACKSON, | DIVISION ONE |
| Petitioner. | UNPUBLISHED OPINION |

CHUNG, J. — Richard Jackson appeals from the trial court's order committing him to the Department of Social and Health Services' custody until he no longer meets the definition of sexually violent predator, pursuant to RCW 71.09.060. Jackson asserts that the trial court erred by concluding that his mental abnormality continues to make him likely to engage in predatory acts if not confined to a secure facility. We disagree and affirm.

FACTS

Between 1982 and 1996, Richard Jackson was convicted of four separate sexual offenses, all involving minor victims. Jackson was committed as a sexually violent predator (SVP) in an Order of Commitment entered by the Snohomish County Superior Court on October 9, 2003. He was committed to the Special Commitment Center (SCC) on McNeil Island, Washington, to the custody of the Department of Social and Health Services.

While at SCC, Jackson was found to be in possession of child pornography and was convicted in 2006 of possession of depictions of minors

engaged in sexually explicit conduct with sexual motivation. In 2011, after serving his sentence at a Department of Corrections (DOC) facility, Jackson was returned to SCC.

In September 2019, the Snohomish County Superior Court entered an order conditionally releasing Mr. Jackson to a less restrictive alternative (LRA) at the Secure Community Transition Facility in King County. Jackson was later released to a community LRA at Journey Project in Tukwila, Washington in June 2021. As part of his LRAs, Jackson was assigned a residential community transition team, consisting of Certified Sex Offender Treatment Provider Stephanie Overton, DOC Corrections Specialist Christopher Ervin, and an SCC representative, to provide treatment and supervision. Both LRAs include multiple provisions with which Jackson must comply in order to continue residing in the community.

Shortly after being released to the Journey Project, Jackson incurred a violation for having contact with a minor at a grocery store. In the incident, Jackson saw a minor blocking access to the ice cream freezer. Instead of leaving the aisle, he approached the minor and said "excuse me" to get the minor to move and "thank you" after he obtained his ice cream. Jackson immediately disclosed this to his chaperone and to Ervin.

Sometime prior to December 2021, Jackson purchased and watched a movie with "coming of age" themes, which is prohibited by his LRA. Jackson disclosed the violation a short time later.

2

In August 2021, Jackson saw a minor girl at a restaurant whom he "body-parted," meaning he imagined what her vagina looked like. He told his chaperone that he was distracted by an adult. He did not disclose the truth until his treatment session with Overton.

In December 2021, Jackson purchased a compact disk (CD) by a child singer with a picture of the child on the cover. Jackson actively concealed his purchase in order to hide it from his chaperone. Jackson did not disclose this violation to Overton for over a month.

Jackson incurred an additional violation by viewing media on his coworkers' cell phones multiple times over the course of several months. As a consequence for this violation, Jackson was sent back to the SCC for two months in the fall of 2022. Jackson returned to Journey Project in November 2022.

On December 27, 2022, Jackson petitioned the court for unconditional release from his SVP commitment. Based on the agreement of the parties, the trial court determined that Jackson had demonstrated probable cause that his condition had so changed that he no longer met the criteria for civil commitment, and ordered an unconditional release trial pursuant to RCW 71.09.090.

A number of witnesses testified at the unconditional release trial, including Overton, Ervin, Journey Project program manager Thomas Toomey, the State's expert Dr. Harry Goldberg, defense expert Dr. Joseph Plaud, social worker Julia Newbold, and four volunteers who spend time with individuals committed as

SVPs. Although Jackson did not testify, portions of his deposition were played on the record.

The State's expert, Dr. Goldberg, testified that he evaluated Jackson in January 2023 to determine whether he met the criteria for an unconditional release. For his evaluation, Dr. Goldberg interviewed Jackson and reviewed 15,000 pages of documents, including legal records, treatment records, social worker records, prior evaluations, and depositions. Dr. Goldberg diagnosed Jackson with pedophilic disorder, sexually attracted to both, non-exclusive type.[1] Dr. Goldberg testified that he found it notable that Jackson had incurred 17 violations while on LRA and that while most of the violations were "more technical in nature," it was concerning that Jackson "acts without thinking and then covers it up." In Dr. Goldberg's view, Jackson's lack of transparency was a precursor to a "sexually deviant lifestyle."

Dr. Goldberg employed a number of actuarial models in determining Jackson's risk of reoffending. Using Jackson's score of seven on the Static-99R, Dr. Goldberg calculated Jackson's risk of recidivism at 40.2 percent over the next 10 years and 51.1 percent over the next 20 years. However, Dr. Goldberg testified that this number was likely an underestimate, as the Static-99R does not take into account undetected victims, of which Jackson had nearly 60. Dr. Goldberg also estimated Jackson's risk of reoffending using other instruments. Using Jackson's score of nine on the Static-2002R, in the "well above average

---

[1] Dr. Goldberg diagnosed three other disorders, none of which he determined to be mental abnormalities.

risk category," Dr. Goldberg calculated the risk was 36.1 percent over 5 years and 58.6 percent over 20 years. Using Jackson's score of 22 on the VRAG-R,[2] which measures a combination of sexual and violent recidivism, Dr. Goldberg calculated a relative risk of 85 percent compared to other sexual violent offenders and a risk of 58 percent over 5 years and 78 percent over 12 years. Dr. Goldberg concluded that as a result of his mental abnormality, Jackson is likely to engage in predatory acts of sexual violence if not confined to a secure facility.

The defense expert, Dr. Plaud, agreed that Jackson suffers from pedophilic disorder. However, Dr. Plaud did not believe that this constituted a mental abnormality, as Jackson had demonstrated that he is able to control himself. Dr. Plaud also agreed that Jackson had engaged in deceitful behavior, but did not believe that this made him more likely to engage in sexual violence, as the behavior "doesn't happen in environments that are inherently . . . more risk relevant." Dr. Plaud's opinion was based only on the Static-99R instrument. Dr. Plaud calculated the same score as Dr. Goldberg did, seven, but provided a range of risk estimates rather than one figure. Dr. Plaud calculated Jackson's risk of recidivism between 20.9 and 26.7 percent over the next five years and between 27.3 and 38.2 percent over the next 10 years. Dr. Goldberg's estimates were higher because he used the "high risk/high needs" population sample, whereas Dr. Plaud used the "routine sample."

Jackson's treatment provider, Overton, testified about her work with Jackson since he was released on his LRA. Overton testified that although

---

[2] Violence Risk Appraisal Guide.

Jackson has been making progress in his treatment, his progress has been inconsistent, as he does not always complete his assignments. According to Overton, Jackson had recently been spending too much time paying attention to children while in the community. Overton was concerned about this behavior, as it left the door open for Jackson to revert to his old behavior patterns. Overton also expressed concern over Jackson's purchase of the CD, which she described as an intentional violation of his LRA. Overton noted that Jackson tends to blame external factors rather than taking responsibility for the violations of his LRA.

Overton also described Jackson's offense cycle, which she defined as "a pattern of behavior that leads up to an offense" that starts long before the actual offending behavior. According to Overton, Jackson's offense cycle involved negative emotionality, impulsivity, feelings of loneliness, and secret-keeping. Overton testified that she believed that the CD purchase was part of the offense cycle, as it demonstrated his impulsivity and need for gratification.

Jackson's community correction specialist, Ervin, testified similarly. Ervin noted that Jackson will complete homework assignments if prompted, but has often failed to turn in assignments in a timely manner. Ervin also noted that Jackson has violated his LRA over 15 times, and when asked about those violations, Jackson "doesn't tend to commit to any one specific answer. He tends to give me vague answers that leave possibilities open."

Following trial, the trial court entered the court's findings of fact, conclusions of law, and order following bench trial ("the Order"). Therein, the trial court concluded that the State proved beyond a reasonable doubt that (1)

6

Jackson was previously committed as an SVP, (2) Jackson suffers from a mental abnormality as defined in RCW 71.09.020(9), (3) Jackson's mental abnormality causes him serious difficulty in controlling his sexually violent behavior, and (4) Jackson's mental abnormality makes him likely to engage in predatory acts of sexual violence if not confined in a secure facility.

Jackson appeals.

## ANALYSIS

An individual civilly committed as an SVP is entitled to an unconditional release trial if he demonstrates probable cause that he "no longer meets the definition of a sexually violent predator." RCW 71.09.090(2)(a)(i). At trial, the State has the burden to prove "beyond a reasonable doubt that the committed person's condition remains such that the person continues to meet the definition of a sexually violent predator." RCW 71.09.090(3)(c). To establish that a person continues to meet the definition of an SVP, the State must prove (1) that the person has been "convicted of or charged with a crime of sexual violence," (2) that the person "suffers from a mental abnormality or personality disorder," and (3) that the mental abnormality or personality disorder makes the person "likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(19); see also In re Det. of Harell, 5 Wn. App. 2d 357, 369, 426 P.3d 260 (2018). The trial court's conclusion on the third element is a "compound determination" that requires the court to find that the disorder causes the likelihood of future offenses and a probability of reoffending to be greater

7

than 50 percent. Harell, 5 Wn. App. 2d at 370 (quoting In re Det. of Post, 170 Wn.2d 302, 310, 241 P.3d 1234 (2010)).

Jackson does not challenge the trial court's conclusion that the first two elements have been satisfied. Instead, Jackson challenges the trial court's conclusion that the State proved the third element, that his disorder continues to make him likely to engage in predatory acts of sexual violence if not confined to a secure facility.

We review a trial court's conclusion that an SVP's mental abnormality renders him likely to engage in predatory acts of sexual violence for sufficiency of the evidence. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). Although a hearing about SVP commitment is a civil proceeding, the quantum of evidence is examined under a criminal standard. In re Det. of Thorell, 149 Wn.2d 724, 744, 72 P.3d 708 (2003). "Under this approach, the evidence is sufficient if, when viewed in the light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. ("We hold, when viewed in the light most favorable to the State, there must be sufficient evidence . . . to allow a rational trier of fact to conclude the person facing commitment has serious difficulty controlling behavior."); see also In re Det. of Belcher, 189 Wn.2d 280, 290, 399 P.3d 1179 (2017) ("The State must prove . . . that the SVP continues to suffer from a mental abnormality and that he or she would likely reoffend if released from confinement."). When claiming insufficient evidence, a defendant necessarily admits the truth of the State's

evidence and all reasonable inferences that can be drawn from it. State v. Drum, 168 Wn.2d 23, 35, 225 P.3d 237 (2010).

As an initial matter, Jackson asserts that due process requires the State to prove that he is currently dangerous and that the evidence presented does not demonstrate a risk of reoffending in the near future. For this assertion, Jackson relies upon In re Det. of Moore, 167 Wn.2d 113, 216 P.3d 1015 (2009). In Moore, the Supreme Court noted that under United States Supreme Court precedent, "due process requires the State to prove that the alleged SVP is mentally ill and currently dangerous." 167 Wn.2d at 124 (citing In re Pers. Restraint of Young, 122 Wn.2d 1, 27, 857 P.2d 989 (1993)). However, the court went on to hold that "by properly finding all the statutory elements are satisfied to commit someone as an SVP, the fact finder impliedly finds that the SVP is currently dangerous." Id. The court thus declined to impose an additional burden on the State to prove that "the SVP will reoffend in the foreseeable future." Id. at 125.

Next, Jackson assigns error to findings of fact 27, 36, 41, 54, and 58. These findings read as follows:

> 27. Mr. Jackson testified about his offense history and admitted to sexually abusing approximately 70 children, about 60 males and 10 females. Some of his victims he orally and/or anally raped numerous times.
>
> 36. Dr. Goldberg testified credibly and persuasively about the bases of his opinion that Mr. Jackson meets the criteria for Pedophilic Disorder, Sexually Attracted to Both, Nonexclusive Type. Dr. Goldberg relied on Mr. Jackson's extensive history of sexually abusing children, the number of his victims, his behavior resulting in Possession of Depictions of Minors, his body-parting of the minor girl at the restaurant, his violation involving the CD, the number of his LRA violations, and the fact that he was not

9

immediately transparent about some of his violation behavior and willfully violated other conditions. Dr. Goldberg also relied on Ms. Overton's feedback about Mr. Jackson's treatment progress.

41. The Court finds that Mr. Jackson's the [sic] pattern of secreting certain thoughts or behavior escalated, and that it is the impulse to secret-keep and escalation of this impulse to secret-keep that is most risk relevant.

54. Dr. Goldberg stated that if unconditionally released, Mr. Jackson's release plan includes residing at Journey Project for a period and then potentially moving to a nearby trailer park. Mr. Jackson also plans to continue treatment with Ms. Overton. Though Mr. Jackson works full time, Dr. Goldberg believes Mr. Jackson's budget is unrealistic.

58. Dr. Goldberg credibly opined that based on his risk assessment, Mr. Jackson's mental abnormality makes him likely to commit predatory acts of sexual violence if not confined in a secure facility. Mr. Jackson's current LRA is a "secure facility" as defined by the statute.

Jackson does not contend that these findings of fact inaccurately reflect Dr. Goldberg's testimony. Rather, Jackson argues that the trial court should not have relied upon Dr. Goldberg's testimony in finding that he was likely to reoffend if not confined to a secure facility. This is so, he claims, because Dr. Goldberg discounted the minor nature of Jackson's LRA violations, overemphasized two incidents of secret-keeping, exhibited racial bias in an unrelated case, and exhibited class bias in this case. But rather than review the court's factual findings, on appeal, we view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Thorell, 149 Wn.2d at 744. Thus, to the extent Jackson's arguments and corresponding assignments of

error concern Dr. Goldberg's credibility[3] and the weight the trial court should have afforded his testimony, they are misplaced.

Jackson further argues that the only evidence that demonstrates that he was likely to reoffend is Dr. Goldberg's testimony that the Static-99R showed an estimated risk of repeat offense above 50 percent after 20 years, and that a risk of repeat offense in the distant future is too attenuated to satisfy the State's burden of proof. Jackson relies upon the court's statement in Moore that, "[f]or example, if an expert predicts that an alleged SVP will reoffend only in the far distant future, then there is less likelihood that the 'more probable than not' standard has been legally satisfied." 167 Wn.2d at 124 (quoting former RCW 71.09.020(7) (2010)). Jackson argues that this statement demonstrates that because Dr. Goldberg testified to a likelihood of recidivism only in the far future, the State could not have legally satisfied its burden of proof. In addition to being mere dicta, this excerpt from Moore does not state that such testimony by an expert is conclusive, as Jackson would have us read it. Indeed, such an argument was rejected by the Supreme Court in In re Det. of Meirhofer, 182 Wn.2d 632, 645, 343 P.3d 731 (2015) ("However, the SVP act does not limit experts to the results of actuarial tests and there is no requirement that 'the SVP will reoffend in the foreseeable future.' ") (quoting Moore, 167 Wn.2d at 125).

Jackson's argument is also premised on an overly narrow view of the evidence. Dr. Goldberg's testimony concerning the Static-99R was not the sole basis for the trial court's conclusions that Jackson was likely to reoffend if

---

[3] The trial court found both Dr. Goldberg and Overton's testimony to be credible.

unconditionally released. Dr. Goldberg also used other instruments; using the Static-2002R, he calculated a risk of 36.1 percent over 5 years and 58.6 percent over 20 years, and using the VRAG-R, he calculated a risk of 58 percent over 5 years and 78 percent over 12 years. Dr. Goldberg testified that Jackson's "body-parting" of the minor girl at the restaurant and his purchase of the CD of the child singer were indicative of dysfunction and continued sexual desire of children. Dr. Goldberg also testified that Jackson's acts of concealing his violations "are the kind of precursors that predispose him to commit criminal sexual acts." Although Dr. Goldberg noted that most of Jackson's violations were "technical in nature," he had "a lot of violations in comparison to other people [he had] evaluated." Dr. Goldberg explained, "[H]e needs to be more transparent and let them know he is deviating from his treatment plan, so that's the issue, which I think also can be factored into the sex-offending cycle. He acts without thinking and then covers it up, so that's my concern." Dr. Goldberg found it concerning that "these kind of dynamics happen over and over again." As to the Static-99R itself, Dr. Goldberg testified that the results of the tool are an underestimation of risk because the Static-99R does not take unknown victims into account.[4]

---

[4] Jackson also asserts that the trial court erred by not including in finding of fact 27 the dates of his acts of sexual abuse, and that he admitted to the offenses 32 years ago in 1991. For sufficiency of evidence, we do not review the particular findings of fact, but the evidence in the record. Regardless, the prior offenses were not the bases for the determination that Jackson was likely to reoffend.

Finally, Jackson asserts that the trial court erred by including in finding of fact 54 that Dr. Goldberg believed his budget for his living expenses was unrealistic. Again, we do not review the particular findings of fact, but the record evidence, and Goldberg's opinion about Jackson's budget was not a basis for the determination that Jackson was likely to reoffend.

Furthermore, the trial court did not rely on Dr. Goldberg's testimony alone in reaching its conclusions of law. Overton, Jackson's treatment provider, testified that Jackson's treatment progress has been inconsistent, he does not always take his LRA seriously, and he does not always complete his treatment assignments. Overton testified that Jackson's body-parting of the child at the restaurant and his purchase of the CD are part of his offense cycle and "opens the door for other behavior." Overton also noted that Jackson had recently been paying too much attention to children in the community, sometimes without realizing he was doing so. Additionally, multiple witnesses noted that over the course of five months, the length of time Jackson concealed his LRA violations extended from a minimal amount to a month and a half. Overton testified that this secrecy "can be dangerous."

The cumulative testimony of the witnesses, particularly Dr. Goldberg and Overton, supports the trial court's conclusion that the State met its burden to prove that Jackson would likely reoffend if unconditionally released. When viewed in the light most favorable to the State, the record evidence is sufficient that a rational trier of fact could have found the essential elements for Jackson's continued commitment beyond a reasonable doubt. Therefore, Jackson does not demonstrate any error by the trial court.

We affirm.

13

Chung, J.

WE CONCUR:

Brenner, J.        Mann, J.